## Alderson v. Alderson.

(Decided June 19, 1931.)

(As Modified on Denial of Rehearing November 20, 1931.)

ROBERT L. PAGE and LEON P. LEWIS for appellant.

WOODWARD, HAMILTON & HOBSON and HORNE & GRAFT for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER—Affirming in part and reversing in part.

Clifford L. Alderson has appealed from a judgment awarding his wife, Florence Catherine Alderson (nee Reilly, Oct. 25, 1894), a divorce from bed and board,

awarding her $30,000 in a lump sum for alimony, and awarding her attorneys $3,500 for their services in the trial court. These attorneys are parties to this appeal and are asking for $15,000 for their services in the trial court, and for a fee for their services here. Mrs. Alderson by cross-appeal is asking that this allowance to her be increased from $30,000 to $79,912.14, that being the sum that loaned at 5 per cent interest would be required to pay Mrs. Alderson $5,000 per annum during the defendant's expectancy of life. This case was carefully considered by the trial court; he prepared an opinion, a large part of which is here given:

"This was originally an action not only for alimony but also for absolute divorce on the ground of six months habitual cruelty, but, since the petition showed that it has been filed less than three months after the marriage, a demurrer was sustained to so much of it as sought an absolute divorce and the case was thereafter prepared chiefly as an action for separate maintenance, although there was a prayer in the alternative for a decree of separation. On May 8, 1930, an amended petition was filed, praying an absolute divorce, upon the ground of six months habitual cruelty and a week or ten days later defendant filed an amended answer in which he prayed for a decree of separation upon the ground of abandonment.

"This is a very puzzling case. The marriage between these parties, while made under unusual circumstances, was made under auspices that appeared to be very favorable. Upon the part of the bride there were beauty and charm. Upon the part of the bridegroom there were wealth and steadiness and a quiet affability which had endeared him to a wide circle of friends and acquaintances. But within less than three months (if not within a single month) the happiness of this couple lay in ruins about them.

"The record in this case contains more than a thousand pages and yet it fails to disclose the cause of the disaster. I have read the record more than once. Some parts of it, and particularly the depositions of plaintiff and defendant, I have read over and over again, and I can find in it no explanation of such a catastrophe. Many little things are recounted which might well have been the cause of

some trivial disagreement but nothing which could be the cause of the utter destruction of true love between a man and a woman.

"Defendant adopts the explanation that the plaintiff married him solely for mercenary motives and suggests that all of her subsequent conduct has been dictated by a purpose to force a separation and to get from him as much money as possible in a settlement of her right to maintenance. Upon the other hand, plaintiff adopts the explanation (certainly it is adopted by her sister, Mrs. O'Connel) that defendant married plaintiff without having any true love for her, but solely for the gratification of his carnal desires.

"Neither of these explanations is sufficient in itself, to account for the conduct of the innocent party. A woman who has married for money might conduct herself as plaintiff has conducted herself, but her husband would hardly have behaved as defendant has behaved. A man marrying out of mere lust, might have conducted himself as defendant has conducted himself, but his wife would hardly have behaved as plaintiff has behaved.

"It is not possible to take the view that these parties were swept off of their feet by a sudden storm of passion which has died down as rapidly as it came up. The age and experience of each of them preclude such a supposition. Defendant is 39 years of age, has had a successful business career and has evidently knocked about the world in a way to make him immune to the follies of youth. There was at first some doubt about plaintiff's age. She testified that she was 28 years old but subsequently admitted that this was a mis-statement and it now appears that she was at the time of her marriage 34 or 35. She had been educated in the public schools and had a year or two in the University of Louisville. For eight years, she had been employed in a clerical position in the office of the Louisville and Nashville Railroad Company. While she had lived constantly with her mother, she was not unfamiliar with the night life of a large city, since it appears abundantly that she had been in the habit of going to dances at hotels and other places of public entertainment. Her first meeting with her future husband was when she was taken out to his home at 10:30 or

11:00 o'clock at night by a gentleman who was a friend of both. She smoked and she drank. I do not mean by this to disparage her character in any way, since in these days no such inference can be drawn from such habits. I mean merely to point out that there was no lack of sophistication on the part of either plaintiff or defendant, a circumstance which I think must be taken into account in judging their conduct.

"I have said that this marriage took place under somewhat unusual circumstances. Defendant had met plaintiff only two or three times, and at long intervals, prior to April or May, 1929, at which time he became very attentive to her. Early in June of that year, he became engaged to her. He desired that their engagement should be kept secret for the somewhat whimsical reason that he was afraid of being teased by his friends for abandoning an apparently confirmed bachelorhood. Plaintiff agreed to this and it is a fact that, excepting one or two, all of the defendant's friends, including his sister, were ignorant of the engagement until the marriage was announced in the newspapers. Even plaintiff's mother, Mrs. Reilly, and her sister, Mrs. O'Connel, did not learn of it until the evening of the day before the departure of plaintiff and defendant for New York, where they were married on July 6, 1929. Even at that late hour, plaintiff was not entirely candid with her mother and sister. She told them that she was to meet the defendant in New York and testified in her original deposition that she did so, although she subsequently admitted that she had gone to New York with defendant. They were married on July 6th, and on the following day boarded the S. S. 'Aquitania' for England. After a stay of three or four days in London, they went to Berlin and after three or four days there, went to Paris, where they joined plaintiff's friends, Mr. and Mrs. O'Brien. After a week of sight-seeing, shopping, and gayety, they embarked on the steamer 'Berengaria' for New York, where they took the train for Louisville almost immediately, arriving at the latter place in the early afternoon of August 4th, or exactly four weeks after their departure from Louisville.

"The testimony relates chiefly to the six or seven weeks following their arrival in Louisville, although both plaintiff and defendant testify as to certain occurrences during their trip abroad. The impression made upon me by the record is that their love for each other, if there had ever been any true love between them, had come to an end before they reached Louisville. It seems to me that their subsequent conduct can only be explained upon that theory. I shall not attempt to review in detail the happenings following the return to Louisville, upon which plaintiff relies as furnishing a justification of her abandonment of defendant. They began with defendant's allowing plaintiff to leave the Pennsylvania train at Fourth and A Streets, alone and with two or three pieces of hand luggage, while he went on to the terminal station, ostensibly to attend to the trunks. He allowed her to find an apartment by herself, arranging merely that she should telephone him about noon the next day and advise him where he could find her. She did communicate with him the next day and he called at the apartment, where she was staying with her mother, and took her out to spend the afternoon with some of his friends. That evening at eight o'clock, he brought her back to the apartment but did not get out of the car, allowing her to go in by herself. The next three or four days she spent in a hospital, where she received treatment for a slight infection of a finger, and it was for this reason that she did not go to their home sooner. During the time defendant called at the hospital twice each day and brought her flowers. He took her to his home in the country on the following Friday. Two days thereafter he went to Detroit and spent a week at a convention of Cadillac dealers, a visit which was strictly in line with his business and of which plaintiff had been advised before her arrival in Louisville. Defendant returned to Louisville and to his wife on August 18th and two or three days later his sister, Mrs. Brady, who had been his housekeeper for a year or more, left on a three weeks trip to New York, for the purpose, as she claims, of giving plaintiff an opportunity to take charge of the household and install herself definitely at the head of the establishment. On or about September 1st, defendant went to Detroit again on business and remained away

two or three days. Mrs. Brady returned on Sept. 11th and on Sept. 16th, plaintiff came in town to her sister's apparently because of her displeasure over something that Mrs. Brady had said to her the evening before, in which defendant, as plaintiff claims, sided with his sister rather than with his wife.

"During her ensuing absence of four days, defendant appears to have made no attempt to communicate with her, although he did call on her sister, Mrs. O'Connel, at the latter's request, at which time some discussion was had as to the relations between plaintiff and defendant. Mrs. O'Connel says that on this occasion defendant seemed entirely indifferent about seeing his wife and 'displayed a very nonchalant attitude.' On Sept. 19th, plaintiff returned to defendant's home in a taxicab and finally left the home on September 26th, as the result of overhearing a telephone conversation between Mrs. Brady and some unknown person, in which Mrs. Brady spoke of plaintiff in a very uncomplimentary fashion. The suit for divorce was commenced on October 4th, and on Oct. 9th, plaintiff commenced an action against Mrs. Brady for $50,000.00 damages for the alienation of her husband's affections.

"I think it proper to say at this point that the Reillys (Mrs. Reilly, Mrs. O'Connel and Mrs. Alderson) seem to me not very accurate witnesses. Each of them was guilty of one or more untruthful statements in the course of her deposition. It is true that these inaccuracies related to matters that were not very important, but then tend to confirm an impression I have that the testimony of these witnesses is in some points exaggerated and strongly colored by their interest.

"I have made no attempt in the foregoing summary of events after the return of this couple to Louisville to deal with all of the occurrences upon which plaintiff relies to show defendant's fault or those on which defendant relies to exonerate him from blame. To do this, and to do it fairly, would extend this memorandum beyond all reasonable limits.

"While there is a direct contradiction between plaintiff and defendant as to many occurrences during the period of time since their return, I think it must be said that even defendant's own story shows

that his conduct toward his wife was very unloverlike. There was a lack of attention and an indifference which it is difficult to explain except upon the theory, stated above, that an estrangement had taken place even before they returned to Louisville. And this is borne out by plaintiff's own conduct. She appears to have made no effort to stop the progress of the estrangement which was developing before her very eyes. She was, I think, almost as indifferent to defendant as he was to her. Three times (including her stay in the hospital) she absented herself from her husband's home for insufficient reasons. She readily acquiesced in the suggestion that her going to his home be postponed to the day after their return and this she did because she wanted to be with her mother for a day or so. She spent altogether about five or six weeks in defendant's home. During three of those weeks, Mrs. Brady was absent. Plaintiff made no attempt to take charge of the household. She gave no directions to the servants, she ordered no meals, she made no effort to fit herself into her new position. She was bored with the country, she took no interest in the place, she disliked going to bed at 10 or 11 o'clock, being accustomed, as she is reported to have said, to stay up until 2 or 3 o'clock. She never breakfasted with her husband, although his breakfast hour was 8:30, but remained in bed until 10 o'clock or later. It seems to me that there was not a day in that time when she might not have done something which would have tended to a reconciliation or which, if it had not resulted in a reconciliation, would have demonstrated that defendant was entirely at fault. But she did none of these things. She allowed things to drift toward that final catastrophe which must have been foreseen by both of them.

"I repeat what I said in the beginning. The case is a puzzling one. The causes to which the catastrophe is ascribed are insufficient to explain it. As I read the record I have the constant feeling that there is something that has not been disclosed. My mind goes back to the episode of the wedding ring in Berlin. There had been some trifling disagreement about sight-seeing. Defendant finally asked plaintiff if she loved him or was sorry she had married him and receiving no answer

repeated his question without getting an answer. He says she was twirling her wedding ring on her finger and he then said to her that, if she regretted the marriage, she would show her sincerity by taking off the ring. She did take it off and handed it to him (so he says), when he tossed it onto the bureau, whence it rolled off into the wastebasket, from which she subsequently retrieved it.

"She tells the story a little differently: but whatever be the exact truth, I wonder what was back of the episode. The spiritual alliance was broken then, if it had ever existed, and the reason is undisclosed. After that, so far as this record discloses, no effort was made on either side to renew it. A decree will be entered granting plaintiff a divorce from bed and board, alimony in the lump sum of $30,000.00, and judgment for her costs, including an attorney's fee of $3,500.00."

This marriage has proven to be a disaster for both of these people. The final rupture was the result of an act of Mrs. Alderson. She left her husband. To enable her to recover she must justify that act. She has not done so. If there were no evidence for the defendant, and the cause were submitted on the evidence for the plaintiff, we would say the same. She has wholly failed to show any sufficient cause for leaving her husband. Mr. Alderson took her on a nice trip, that included the cities of New York, London, Berlin and Paris. He installed her in his beautiful home upon the repair of which he recently expended $30,000. He placed a chauffeur and an automobile at her disposal, and the record shows she used this service apparently daily. He had her given lessons in driving an automobile and promised to give her a machine when she had learned to drive. He placed her in charge of his household, she denies this, but the evidence of other witnesses supports her husband. She took no interest in the home, never took any interest in the conduct of the household or the entertainment of the guests that visited them, except to direct a servant on one occasion when her mother was there to prepare a T-bone steak. Her husband had servants to do the work of the household, but she gave them no directions. She even refused to sew a button on his clothing. In about three months' time he gave her and she spent about $3,000 of his money. She gave no evidence of appreciation of all he was doing for her. He would be

superhuman if he and his conduct were not affected thereby.

Love is not immortal. If we want to be loved we must be lovable. That is a statement that is as old as philosophy. Horace wrote it this way: "Ut ameris, amabilis esto." This case cannot be distinguished from that of Axton v. Axton, 182 Ky. 286, 206 S. W. 480. The judgment awarding Mrs. Alderson $30,000 alimony is reversed, the allowance of $3,500 to her attorneys is affirmed, as the proof shows Mrs. Alderson has no estate of her own. See Luttmer v. Luttmer, 143 Ky. 844, 137 S. W. 777. The motion of her attorneys for an additional allowance for services in this court is overruled, and their motion for an increase of the allowance made them to $15,000 is overruled. The award of $30,000 made to Mrs. Alderson cannot be sustained. The decree entered does not bar her dower or distributive right in Mr. Alderson's property. See section 2121, Ky. Stats. Any award made her should be payable monthly so that the chancellor can modify it from time to time and keep it adjusted to the condition of the parties. That clearly appears to be contemplated and provided for by section 2121, Ky. Stats.

On original appeal the $30,000 judgment in favor of Mrs. Alderson is reversed; in all other respects the judgment is affirmed upon both the original and the cross appeals.

The whole court sitting.